IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

CARMEN COMSTOCK                                                                                    PLAINTIFF

vs.                                            CIVIL NO. 05-5088

JO ANNE B. BARNHART, COMMISSIONER
SOCIAL SECURITY ADMINISTRATION                                                                     DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Carmen Comstock, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying her claim for disability insurance benefits (hereinafter "DIB") under the provisions of Title II of the Social Security Act (hereinafter the "Act").

**Procedural Background:**

The application for DIB now before this court was filed on March 11, 2003, alleging an onset date of May 1, 1996,[1] due to a mood disorder; bipolar disorder; panic disorder; depression; obsessive-compulsive disorder; migraine headaches; fibromyalgia; neck, back, elbow, hip, and knee pain; and, anorexia nervosa. (Tr. 13-14, 57-59). An administrative hearing was held on July 27, 2005. (Tr. 544-565). Plaintiff was present and represented by counsel.

On January 13, 2005, the Administrative Law Judge (hereinafter "ALJ"), issued a written decision finding that plaintiff's mood disorder; migraine headaches; fibromyalgia; depression, neck, back, elbow, hip, and knee pain; bipolar disorder; panic disorder; anorexia nervosa; and, obsessive-

---

[1]Records indicate that plaintiff had previously filed an application for DIB in November 2001. (Tr. 14). That claim was initially denied on June 24, 2002, and plaintiff failed to pursue it further. (Tr. 14). We note, however, that the ALJ reopened this application by utilizing and referring to medical evidence obtained prior to June 25, 2002.

compulsive disorder were severe impairments, but that those impairments did not meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 21). Further, he found that plaintiff was insured for benefits through September 30, 1997. After discrediting plaintiff's subjective allegations, the ALJ concluded that she maintained the residual functional capacity ("RFC") to perform a wide range of light work, limited only by her inability to work near heights and moving machinery and moderate limitations in the areas of understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration; completing a normal workday and workweek; performing at a consistent pace without an unreasonable number and length of rest periods; accepting instructions; responding appropriately to criticism from supervisors; setting realistic goals; and, making plans independently of others. (Tr. 20, 21). From a mental standpoint, the ALJ determined that plaintiff could perform work where the complexity of tasks was learned by rote with few variables and little judgment and, the supervision required was simple, direct, and concrete. (Tr. 20). With the assistance of a vocational expert, he then found that plaintiff could perform the positions of motel maid, security guard, and fast food preparation worker. (Tr. 21).

At the time of her alleged onset date, plaintiff was thirty-seven years of age. (Tr. 13). Plaintiff has a high school education and two years of college (Tr. 13, 73, 101). Records indicate that she has past relevant work experience as an aerobics instructor, waitress, and computer operator. (Tr. 13, 76, 109).

On April 15, 2005, the Appeals Council declined to review this decision. (Tr. 3-5). Subsequently, plaintiff filed this action. (Doc. # 1). This case is before the undersigned for report and

recommendation. Both parties were afforded the opportunity to file appeal briefs, but plaintiff chose not to do so. (Doc. # 3).

**Applicable Law**:

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

3

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. *See* 20 C.F.R. §§ 404.1520(a)- (f)(2003), 416.920. Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schwieker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §§ 404.1520, 416.920 (2003).

**Discussion:**

Of particular concern to the undersigned is the ALJ's failure to properly consider the evidence concerning plaintiff's migraine headaches. *See Reeder v. Apfel*, 214 F.3d 984, 988 (8th Cir. 2000) (holding that the ALJ is not free to ignore medical evidence, rather must consider the whole record). The pertinent medical evidence reveals as follows. On May 6, 1996, Dr. Neaville gave plaintiff a prescription for Vistaril. (Tr. 292). She complained of a migraine headache with associated vision problems and vomiting. (Tr. 292).

On August 27, 1996, plaintiff was treated for swelling around her eyes and a headache. (Tr. 277). She had reportedly experienced a similar allergic reaction in the past. Dr. Jerry Hitt diagnosed her with an allergic reaction, headache, and recent dental surgery. He then gave her an injection of Decadron and Decadron LA as well as a prescription for Lorcet Plus. (Tr. 277).

On September 23, 1996, plaintiff complained of nausea, vomiting, coughing, and congestion. (Tr. 274). In addition, she was reportedly suffering from a headache. Aside from purulent postnasal drainage, a physical exam was within normal limits. Dr. Christopher Johnson diagnosed her with gastroenteritis with dehydration. Because she did not have an adequate response in the clinic, he opted to have her admitted for observation and rehydration. (Tr. 274).

On October 4, 1996, plaintiff continued to report difficulty with severe headaches. (Tr. 266). Although Dr. Neaville considered doing an MRI, he opted not to do so until her hallucinations stopped. He indicated that her headaches could be caused by her schizophrenia and/or chronic anxiety. Accordingly, she was given an injection of Toradol and Vistaril and directed to increase her dosage of Haldol. (Tr. 266).

On October 7, 1996, plaintiff was treated for hallucinations. (Tr. 265). She was reportedly doing better, after being started on Haldol. However, plaintiff was still complaining of a severe headache. An examination revealed tenderness in the frontal sinus area. Dr. Neaville noted, however, that this seemed a lot like her psychiatric episodes that he had previously treated with Haldol, Cogentin, Prozac, and Klonopin. Accordingly, he maintained her on her current medications and added Augmentin to treat her sinus irritation. (Tr. 265).

On October 10, 1996, plaintiff indicated that she was out of Haldol. (Tr. 263). As a result, she was again experiencing auditory hallucinations. Plaintiff also reported a severe headache. Although Dr. Neaville discussed with her the possibility of doing a CT scan or MRI of her brain, plaintiff did not wish to do this due to cost. Plaintiff was given a Demerol and Vistaril injection for her headache and restarted on Haldol. (Tr. 263).

On October 12, 1996, plaintiff complained of a severe headache with photophobia after having her upper teeth pulled and braces applied. (Tr. 221). She reported experiencing three black-out spells the previous day. In addition, plaintiff complained of numbness on the left side of her body and clumsiness. Accordingly, plaintiff was diagnosed with a muscle tension headache and a history of left sided numbness of undetermined etiology. (Tr. 222). As such, she was admitted for a neurological work-up. (Tr. 222).

On October 15, 1996, Dr. Neaville opined that plaintiff's headaches were likely supratentorial and did not have any underlying pathology. (Tr. 223). A computed tomographic (CT) scan of plaintiff's head with and without contrast was negative. (Tr. 232). Further, a brain magnetic resonance image (MRI) without contrast, an electroencephalography ("EEG"), and a neurological examination were all normal. (Tr. 222, 230, 233). In addition, x-rays of her lumbar spine, a body scan, an MRI of her thoracic and lumbar spines, and x-rays of her thoracic spine were all negative. (Tr. 225-229).

On October 21, 1996, Dr. Neaville voiced his belief that plaintiff was breaking her Trazodone tablets in two and only taking one-half at a time. (Tr. 259). He also noted that her headache had returned. As such, Dr. Neaville refused to give plaintiff an injection of Demerol. Instead, she was given injections of Vistaril and Toradol. Dr. Neaville then directed plaintiff to increase her Trazodone dosage to every six hours until her headache abated. At that time, she could decrease her medication to every twelve hours. (Tr. 259).

On November 13, 1996, Dr. Neaville noted that plaintiff had recently been treated for a severe headache. (Tr. 220). The pain was so severe that plaintiff reportedly passed out. A neurological work-up revealed no abnormalities. Although plaintiff voiced some concerns regarding

pain in her leg, with an increase in the medication to control her depression and anxiety, she began walking without any problems. An MRI of her thoracolumbar spine, as well as a bone scan were both within normal limits. Accordingly, plaintiff was diagnosed with a severe headache secondary to tension, chronic anxiety, and depression. Her medications included Klonoin, Trazodone, and Prozac. (Tr. 220).

On January 6, 1997, plaintiff was reportedly suffering from severe headache pain and slurred speech. (Tr. 211). Records indicate that she was slow to answer questions, although she was fully oriented with good remote and recent recall. (Tr. 212). She was given Demerol and Vistaril for her pain. (Tr. 211).

On January 13, 1997, Dr. Neaville noted that plaintiff was not doing well coping with her chronic, severe headaches. (Tr. 249). He gave her an injection of Vistaril and directed her to see Dr. Tate the following date to consider a change in her medication. (Tr. 249).

On January 16, 1997, plaintiff complained of frequent headaches. (Tr. 247). Emergency room records indicate that she was taking Prozac, Trazodone, and Klonopin. Further, she indicated that she had tried Imitrex, but that it made her "too high." Aside from a fine hand tremor, a physical examination was normal. Accordingly, Dr. David Garrett placed her on Tizac. (Tr. 247).

On January 22, 1997, notes from the emergency room indicate that plaintiff was hysterical. (Tr. 243). She complained of a very bad headache with associated shortness of breath. Dr. Garrett diagnosed her with a migraine headache and hysteria. For this, he prescribed Toradol and Vistaril. (Tr. 243).

Then, approximately one month after her date last insured, on November 9, 1997, plaintiff was hospitalized due to increasing headaches. (Tr. 199). Over the previous few weeks, she had been

treated in the ER several times for headaches. (Tr. 203, 213, 240). The previous Friday, she was given Nubain for the pain. (Tr. 214, 240). However, later that day, the headache returned. (Tr. 199, 240). Upon examination, Dr. M. T. Dang noted that plaintiff was initially unable to open her eyes or mouth during the examination. However, after a while, she was able to do this without any weakness. Again, plaintiff was treated via Nubain. This time the medication worked for four hours before plaintiff returned to the ER. As such, Dr. Dang had her admitted on November 9, 1997. (Tr. 199). Plaintiff complained of a headache in the frontal area surrounding both eyes. She described the pain as a "dull pressure." Although she was photophobic and did not want to turn on a light or open the window, plaintiff was able to open her eyes. (Tr. 199).

X-rays of plaintiff's paranasal sinuses were negative. (Tr. 188, 200). Further, a neurological examination was normal. (Tr. 200). Due to a problem with urine retention, it was decided that all narcotic medications would be stopped. Accordingly, Dr. Dang prescribed a Solu-Medrol IV for the migraine headaches. (Tr. 200).

On November 15, 1997, plaintiff was admitted following an overdose of pain medication. (Tr. 184). She had been taking Fiorinal, Cafergot, Klonopin, Hydroxyzine, and Prozac. Records indicate that a recent CT scan and laboratory results were both within normal limits, although the CT scan did reveal acute versus chronic left mastoiditis and a right frontal scalp contusion. (Tr. 185, 192). However, because plaintiff did report multiple spells with jerking that could be pseudoseizures or nonepileptic seizures, Dr. Dang ordered an EEG. However, the EEG was normal. (Tr. 190). An echocardiogram also revealed normal left ventricular function with an ejection fraction of sixty-five to seventy percent, normal left ventricular dimensions, a concentric left ventricular hypertrophy, a

morphologically normal aortic and mitral valve, a normal left atrium, and a normal right heart. (Tr. 191).

Dr. Dang noted that plaintiff was a very difficult patient with complaints of headaches, depression, and stress. (Tr. 186). He opined that it would be necessary for her to see a psychiatrist. Accordingly, plaintiff was released home without medication on November 19, 1997. (Tr. 182).

In December 1997, plaintiff was hospitalized due to refractory migraine headaches. (Tr. 197). A physical exam on December 6, 1997, revealed only a large ecchymosis over her forehead, the result of a fall she had experienced after overdosing in November. No other abnormalities were noted. (Tr. 183). Plaintiff's final diagnoses were migraine headaches and a urinary obstruction secondary to narcotics. (Tr. 197). She was released home with twenty Cafergot pills and instructions to take no more than three pills per attack. (Tr. 197).

After reviewing this evidence, the ALJ made the following statement:

> Medical evidence in the record documents that the claimant complained that she had headaches. An EEG done on October 16, 1996, was normal. A CT of the head was negative. An MRI of the brain was negative. An MRI of the cervical and lumbar spine was negative. A total body bone scan was negative. Her headaches were thought to be secondary to tension. Dr. A. D. Bicak advised her to use over-the-counter medications. (Tr. 15).

We note, however, that there are no tests to diagnose migraine headaches. Instead, doctors merely order CT scans, MRI's, EEG's, total body bone scans, and other similar tests to rule out the possibility of other diagnoses. *See* The Cleveland Clinic, *Making the Diagnosis: Doctor's Exam*, *at* www.webmd.com. Therefore, in making the above statements, the ALJ failed to acknowledge the fact that plaintiff had been diagnosed with migraine headaches and was often given Vistaril, Toradol, and Demerol to treat these headaches. (Tr. 211, 243, 249, 259, 263, 266, 292). Further,

9

the record reveals that plaintiff's condition was actually worsening, rather than improving. In fact, in November 1997, she was hospitalized after overdosing on pain medication. (Tr. 199). When questioned, plaintiff indicated that she was not trying to commit suicide. Rather, she stated that she was attempting to get rid of her headache. (Tr. 183). The ALJ did not, however, discuss this medical evidence. *See Martonik v. Heckler*, 773 236, 240 (8th Cir. 1985) (holding that both objective and subjective evidence must be considered, including "medical evidence of a claimant's condition subsequent to the expiration of the claimant's insured status because it may bear upon the severity of the claimant's conditions before the expiration of his or her insured status"). As such, we believe that the case should be remanded to allow him to reconsider the medical evidence concerning plaintiff's migraine headaches. As the record does not contain an RFC assessment completed by any of plaintiff's treating physicians, on remand, the ALJ is directed to address interrogatories to plaintiff's treating physicians, asking the physicians to review plaintiff's medical records, to complete an RFC assessment regarding plaintiff's capabilities during the time period in question, and to give the objective basis for their opinions, so that an informed decision can be made regarding plaintiff's ability to perform basic work activities on a sustained basis during the relevant time period in question. *Chitwood v. Bowen*, 788 F.2d 1376, 1378 n.1 (8th Cir. 1986); *Dozier v. Heckler*, 754 F.2d 274, 276 (8th Cir. 1985).

**Conclusion:**

Based on the foregoing, we recommend reversing the decision of the ALJ and remanding this case to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g). **The parties have ten days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may**

**result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 22nd day of June 2006.

/s/ Beverly Stites Jones
HON. BEVERLY STITES JONES
UNITED STATES MAGISTRATE JUDGE